**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **ISS AVIATION, INC (WYOMING) AND ISS AVIATION, INC. (GUYANA);** | § § § § | |
| | § | **CIVIL ACTION NO.: 4:22-CV-00689-O** |
| **Plaintiffs,** | § § | **JURY TRIAL DEMANDED** |
| | § | |
| **v.** | § § | |
| | § | |
| **BELL TEXTRON, INC.** | § | |
| **Defendant.** | | |

---

### PLAINTIFF'S FIRST AMENDED COMPLAINT

---

TO THE HONORABLE COURT:

Plaintiffs ISS Aviation, Inc. (Wyoming) and ISS Aviation (Guyana) (collectively "Plaintiffs" or "ISS Aviation") files this First Amended Complaint against Defendant Bell Textron, Inc. ("Bell") and states as follows:

## I.  <u>NATURE OF CASE</u>

This is not just a breach of contract case, but is a case about betrayal, deceit, greed, and a concerted effort to prevent Plaintiffs from obtaining the hard-earned commissions to which they were entitled. After ISS Aviation did all of the work in developing the business relations with the Government of Guyana and the Guyana Defence Force for approximately six years on Bell's behalf, procuring a deal with the Guyana Government and the Guyana Defence Force for the purchase Bell helicopters, products, and services.  Indeed, with the finish line in sight and after all deal work had been completed by ISS Aviation, Bell ousted ISS Aviation from the Guyana deal—a deal worth **$256 million dollars**.

## II.  <u>PARTIES</u>

1.      Plaintiff ISS Aviation is a company incorporated in Wyoming.

2.      Plaintiff ISS Aviation, Inc. (Guyana) is a company incorporated in Co-operative Republic of Guyana.

3.      Defendant Bell Textron, Inc. is a Delaware corporation headquartered Fort Worth, Texas and can be served through its registered agent Chandria Mercer at 3255 Bell Flight Boulevard Fort Worth, TX 76118 USA.  Because Defendant has removed this case to federal court, Defendant has acknowledged receipt of the original state petition and will receive service of this pleading by means of the CM/ECF notification.

# I.  JURY DEMAND

Plaintiffs demand a jury trial in accordance with FEDERAL RULE OF CIVIL

PROCEDURE 38(b).

# II.  JURISDICTION AND VENUE

4.      This matter was removed pursuant to 28 U.S.C. § 1441 based on diversity

jurisdiction.  This Amended Complaint arises under 28 U.S. Code § 1332 (a), as the

plaintiff does not share a state of citizenship with the defendant and, the amount in

controversy exceeds $75,000. The Court also possesses supplemental jurisdiction over

state court claims pursuant to 28 U.S.C. § 1367.

5.      The Court possesses personal jurisdiction over Defendant as the Defendant is a

resident of and conducts business in Texas and is considered at home in Texas.

6.      Venue is proper before the Court because the defendant's principal office is located

in Tarrant County. *See* 28 U.S. CODE § 1391(b)(1). Venue is also proper pursuant to section

of Article 19 of the Independent Representative Agreement between Bell Helicopter

Textron Inc. and ISS Aviation, Inc. dated August 15, 2018 ("Independent Representative

Agreement").

# IV.  FACTUAL BACKGROUND

### A.      Bell and ISS Aviation Enter Into an Independent Representative Relationship.

9.      Bell promotes and sells Bell model helicopters, accessories and spare parts, and

distributes these helicopters and aircraft parts nationally and internationally. As a part of

Bell's global marketing and international business, Bell enters independent representative

agreements with certain foreign aviation services companies that have contacts and industry knowledge in the targeted foreign country or region.

10.     In early in and around 2011 and 2012 through early 2013, Bell employees became aware of two affiliate companies to ISS Aviation, which were founded prior to ISS Aviation. The first affiliate company owned and operated Bell helicopters that provided various support services to business executives, individuals, companies, and the government of Guyana. Around 2011 and 2012, the FAA issued an Airworthiness Directive grounding all Bell 206 Long Rangers around the world that possessed identified defective main rotor blades manufactured by Bell.  This created financial hardships for the first affiliate company, which third-parties capitalized on at the expense the company as the first affiliate company's helicopter was grounded for several months at no fault of the company due to the defective main rotor blade manufactured by Bell and no replacement main rotor being in stock with Bell for immediate sale.  As a result of Bell's defective blades, the first affiliate company suffered significant losses and expenses to return the newly purchased helicopter to service.

11.     The second affiliate company sold pre-owned Bell helicopters to the government of Guyana with warranties, delivery, and training.  In addition to selling aircraft and spare parts, the second affiliate company became a U.S. DOT, FAA Part 135 air charter in and around 2012 and a FAA Commercial Air Tour Operator company relying on aircraft owned by the first affiliate company for its operation of air charters and commercial air tours. Certification of the second affiliate company was delayed by the FAA due to the grounding of its first affiliate company's helicopter with the defective blade manufactured by Bell. Naturally, the grounding of the recently purchased Bell helicopter by the first affiliate

company due to the defective Bell manufactured main rotor blades was catastrophic for both affiliate companies, drastically disrupting their business operations.

12.     Despite the disruptions to a significant portion of these affiliate companies' operations due to Bell's defective manufactured main rotor blades, the companies continued to support Bell throughout Guyana by providing helicopter storage, service, logistics and support for Bell's factory-owned helicopters used for sales and demonstrations to the government of Guyana and other governments in South America. This included providing Bell with all special requests sought in Guyana to support their operations in Guyana and neighboring countries in South America.

13.     Greg Johnson, who was a Bell field engineer, Orlando Alaniz, who was a regional sales manager, and other Bell field representatives had discussions with the principal regarding their extreme satisfaction as to the service and support provided and wanted the principal to consider becoming an independent representative of Bell in Guyana and the Guianas region to include Suriname and French Guiana.

14.     The idea of becoming an independent representative of Bell was very appetizing because of the losses suffered by the two affiliate companies.  The principal saw the opportunity of a new business relationship as a catalyst to financially restructure, stop the hemorrhaging of capital, and a way to not completely lose functionality of the Bell helicopters used for operations in these affiliated entities.

15.     This discussion led to a meeting in Texas with Bell representatives and the ultimate approval of the principal establishing a company for the specific purpose of being the independent representative of Bell in Guyana and the Guianas region to include Suriname and French Guiana.

16.    Relying on this new relationship and approval, in mid-2013, in order to facilitate the emerging Bell independent representative relationship, the principal for the two aforementioned affiliate companies incorporated a new company called ISS Aviation in Guyana for the sole purpose of becoming Bell's independent representative for Guyana, Suriname and French Guiana.

17.    ISS Aviation became the focal point to rectify the damages suffered to the affiliate companies by way of transacting deals on behalf of Bell, particularly commissions and revenues from the major deal being done with the Government of Guyana.

18.    That same year, Bell and ISS Aviation Guyana officially entered a contractual relationship whereby Bell engaged ISS Aviation (Guyana) as its sole independent representative for the sale of new Bell helicopters and parts in the countries of Guyana, French Guiana and Suriname.

19.    Bell informed ISS Aviation that its primary interest was to sell its helicopters to the Government of Guyana and the Guyana Defence Force and intended to rely on ISS Aviation's extensive Guyana connections to initiate and develop those business relationships.

20.    Specifically, Bell understood that ISS Aviation, based on the company's principal and connection to the affiliate companies, had strong relationships with multiple high-level officials of the Government of Guyana, the Guyana Defence Force and in Suriname and had excellent working relationships with the US Embassy and Canadian High Commission.

21.    Bell further knew that ISS Aviation Guyana had and has excellent product knowledge to include technical, marketing, operational, costs, overhaul, services, support, quality, maintenance, confidentiality, storage capabilities, logistics and more. Since the

affiliates were owners and operators of Bell helicopters for several years and had sold the government of Guyana several Bell helicopters with warranties and support and more. Also, acting as a representative to secure support from Bell to keep the government of Guyana helicopters serviceable, properly maintained and supported with parts.

22.     It was ISS Aviation's qualities and more that became of significant interest to Bell and certainly were vital to establishing Bell's presence in Guyana and developing the Bell-Guyana business relationship.

23.     As a part of the parties' Independent Representative Agreement, Bell and ISS Aviation Guyana agreed that ISS Aviation Guyana would be Bell's Independent Representative on behalf of Bell and Bell Companies within the Authorized Territory of French Guiana, Guyana, and Suriname for the marketing and sale of products and services of Bell and the Bell Companies. Of most significance, was for ISS Aviation to establish Bell as the primary resource for the Government of Guyana and potentially other clients for their Guyana helicopter, parts, service and other needs.

24.     Bell specifically chose ISS Aviation as its sole independent representative due to its overwhelming consulting experience; ISS Aviation's knowledge of and experience in the aviation industry; Bell Helicopter product, service, operational,  confidentiality and Director's aircraft sales successes over approximately 35 years with the Government of Guyana; and the Guyana Defence Force; and knowledge of the Guyana market.

25.     Each year, ISS Aviation Guyana worked endlessly in continuing to develop the business relations between Guyana and Bell. In addition to performing the responsibilities identified in Article 4 of the Agreement, ISS Aviation performed the following activities— which many had already been initiated through the earlier affiliate companies and were

ongoing with development and increased intensity and focus through ISS Aviation Inc.—among other things, on Bell's behalf to place Bell in the best position to establish and maintain a business relationship with the Government of Guyana and the Guyana Defence Force:

i.     performed the marketing and sale of Bell helicopters, parts, and services in the authorized territory;

ii.    provided ground support for Bell helicopters arriving and departing in Guyana;

iii.   facilitated new Bell helicopters sales and marketing;

iv.    lobbied the United States Government for approval of sale of Bell helicopters to the Government of Guyana and Guyana Defence Force in order to facilitate the close of the Guyana Deal;

v.     established a United States company (with knowledge, urging, awareness, and permission from Bell) to lobby the United States Government to assist in the support of closing the Guyana Deal.

vi.    brought in Bell helicopter technical representatives to evaluate and assess any old/legacy Bell helicopter for replacement or refurbishing.

vii.   provided research and market intelligence, including ongoing evaluation of the Government of Guyana and the Guyana Defence Force's aviation operations;

viii.  performed public relations in Guyana;

ix.    re-establishing the Government of Guyana and the Guyana Defence Force as a Bell client for new Bell Helicopters; the last time that Government of Guyana and the Guyana Defence Force bought a new Bell Helicopter was around 1981. The only Bell helicopters sold to the Government of Guyana since that period of around 38

years - was when two (2) pre-owned Bell 206 helicopters were sold around 2008 to the Government of Guyana and the Guyana Defence Force by ISS Aviation Inc's sister company in the United States.

x.    coordinated with Bell to source $25 million dollars in financing in 2014 and then $24 million in 2015 from the EDC (Government of Canada Export Finance Corp) for the Government of Canada to finance a fleet of new Bell helicopters for the Government of Guyana and the Guyana Defence Force;

xi.    advised Bell and adhered and complied with the Foreign Corruption Practices Act, Patriot Act and other U.S. government laws;

xii.    provided Bell helicopter storage and stored parts and equipment of behalf of Bell,

xiii.    certain Logistics related to Bell parts and equipment;

xiv.    arranged the dissemination of product and marketing information, demonstration and sale flights for Bell in Guyana to prospective clients; and

xv.    provided relevant and required support, market assessments and security/crime updates showing the need for Bell helicopters for law enforcement, border security, search and rescue and more.

26.    These actions, among others, by ISS Aviation ultimately led to and were the primary, proximate, and procuring cause of the Guyana Deal that was ultimately consummated not too long after Bell's decision to no longer work with ISS Aviation.

27.    As a part of the parties' agreement, Bell promised to, among other things, support ISS Aviation "in its efforts to promote the sale of authorized Products and Services" and timely accept or reject offers to purchase Authorized Products and Services by or obtained by" ISS Aviation. As compensation for ISS Aviation's representative, Bell agreed to pay

ISS Aviation by certain discounts or commissions for the sale of Authorized Products and Services pursuant to Article 6 of the Agreement.

**B. Bell was aware of the various obstacles in re-establishing Bell's presence in Guyana as the government's helicopter dealer but did nothing to support ISS Aviation.**

26.     During the course of the parties' relationship, Bell was aware that there were deliberate attempts by various entities in Guyana to financially ruin ISS Aviation. Bell was aware that certain aviation companies in Guyana were against the Guyana Deal because any such deal would have caused the Guyana Defence Force to be independent and free from relying on private aviation companies to provide its transportation and other aviation needs and further enhance the government of Guyana law enforcement, border security and patrol capabilities and search and rescue. Accordingly, various companies saw the deal as a threat to their economic confidence and ability to generate revenues. Upon information and belief, some of these companies conspired with certain airport officials of the Government of Guyana to obstruct the business operations of ISS Aviation.

27.     Indeed,  upon information and belief, a rival aviation company in Guyana, this company shall be considered the first rival aviation company and had conspired with the government officials at the Cheddi Jagon International Airport, which is wholly owned and controlled by the Guyana Government, to cause financial harm and ruin to ISS Aviation, which eventually led to the government of Guyana Airport officials facilitating and causing the seizure of ISS Aviation's hangar in Guyana. ISS Aviation was required by Bell to maintain its office and presence in Guyana as the Independent Representative. As such, ISS Aviation operated its business from a hangar located at Guyana's Cheddi Jagan International Airport ("CJIA"). ISS Aviation was forced to shift its operations to only its

office in the city without full access of its hangar due to the unlawful interference with its hangar located at the airport.

28.     ISS's hangar housed and supported helicopters for sale as they transited between South America and the United States. Any technical stops occurred in Guyana and ISS Aviation would provide any needed services.

29.     ISS Aviation (Guyana) supported over 75 helicopters transiting from Bell-Textron's U.S. helicopter factory to South America, as well as other clients' aircraft.

30.     Specifically in March of 2017, under Guyana's previous government, the CJIA, along with others and the first rival aviation company, created conditions which placed hurdles in the path of ISS Aviation first by illegally and wrongfully seizing ISS Aviation's hangar and then by completely obstructing ISS Aviation's business operations. The challenges were carefully navigated by ISS Aviation due to the complexities of attempting to keep the Guyana deal on track since ISS Aviation had to continue working with the Government of Guyana and the Guyana Defence Force. This resulted in ISS Aviation Inc only using its office and delaying any legal action to seek the return of its owned hangar at the Cheddi Jagan International Airport. Since ISS Aviation knew Bell and the deal might be jeopardized through any legal action to return its hangar which was owned outright without any debts or liens.

31.     When ISS Aviation informed Bell of the conspiracy concocted against ISS Aviation, Bell did nothing to assist.  In fact, ISS Aviation further informed Bell that one of the companies it was dealing with, was potentially being investigated for other criminal activity by the U.S. Government and may be involved in the obstructions against ISS Aviation, but Bell turned a blind eye and continued doing business with the company,

essentially helping to facilitate the attacks against ISS Aviation. Certain U.S. Government public records  appear to confirm that this specific second rival company was in fact being investigated by the U.S. government.

32.    To keep business relations and to continue representing Bell's interest, ISS Aviation requested to relocate its headquarters to Florida to operate free of unlawful interference and develop better financial stability with U.S. sourced financing and staffing. ISS Aviation informed Bell that the relocation would not disrupt or interfere with its ability to continue representing Bell in Guyana and the region. In fact, Bell would be better supported because the second affiliate company had a hangar in Florida, operating a twin engine Bell Helicopter and certified by the U.S. Department of Transportation and Federal Aviation Administration as a Part 135 Air Charter and FAA Commercial Air Tour Company. This affiliate company was getting visibility from Bell, featured by Bell and referred business to Bell and being asked by Bell to provide market intelligence in the U.S. market. In addition, this affiliate company was the first U.S. company approved by the U.S. government for charter flights between the United States and Cuba with tremendous growth potential and well established in commercial air tours.  But Bell refused this request multiple times, only to have appointed a Florida independent representative for Guyana after  ISS Aviation's agreement was not renewed.

33.    As it turns out, the first rival aviation company is owned by an individual who was under U.S. criminal investigation and has since been convicted and placed in federal prison for federal drug trafficking, bulk cash smuggling and money laundering charges in connection with several flights he piloted from CJIA in Guyana to the United States. ISS Aviation's hangar was located next door to the rival aviation company. This first aviation

company had the power of attorney given to the government of Guyana airport officials to conduct business, make decisions and write checks on behalf of the company. Upon information and belief, certain Guyana airport officials were receiving financial and their benefits from the first rival aviation company, while ISS Aviation business operations were being unlawfully interfered with by the same Guyana airport officials, resulting in numerous difficulties operating and receiving equitable treatment at the airport. This included being told to break down its hangar and remove it from the CJIA airport, airport staff badges being taken away and access to the ISS Aviation owned hangar being throttled and then access being fully denied.

34.     Upon information and belief, Bell was aware of potential investigations and suspicious activities of the second rival company and could have assisted ISS Aviation by discontinuing its business relationship with a company whose owner was potentially under U. S. Government criminal investigation based on U.S. government public records and which ultimately disrupted and stifled the business operations of ISS Aviation. Bell chose to do nothing. Bell did not even discuss it nor investigate the authenticity to determine the course of actions should the concerns be valid, or explore any solutions or considerations of relief for ISS Aviation Inc.

35.     ISS Aviation suffered significant monetary damages due to Bell's refusal to assist and support ISS Aviation, as its Independent Representative, as promised.

**C. Bell Never Intended to Pay ISS Aviation Commissions for the Guyana Deal and Failed to Disclose Material Facts.**

36.     In 2017 and 2018, Mr. Jay Ortiz, of Bell made promises to ISS Aviation regarding the Guyana deal. Prior to entering into the August 15, 2018 Independent Representative

Agreement, Mr. Ortiz continued to make promises to ISS Aviation as to its commitment to supporting ISS Aviation's procurement of the Guyana Deal.

37.     As inducement to continue expending funds and resources and being the independent representative of Bell in order to complete the Guyana Deal, Mr. Ortiz promised that it would provide the necessary support and assistance.

38.     Specifically, Mr. Ortiz and other management of Bell represented that it would provide full support to ISS Aviation Inc. from Bell for any lobbying, introduce ISS Aviation to U.S. government programs to close the government of Guyana deal which required the involvement of the U.S. government or government of Canada and more. This included the careful coordination of all meetings, visits, emails and phone calls to the Government of Guyana to ensure there was one comprehensive and carefully executed strategy to close the transaction and deal with the government of Guyana.

39.     Mr. Ortiz further told ISS Aviation to not worry about the challenges ISS Aviation was facing with the Guyana Deal. Mr. Ortiz promised that Bell was committed to securing the deal through ISS Aviation and that it did not see the challenges as a disappointment.

40.     Mr. Ortiz told ISS Aviation to keep pressing ahead with its representation.

41.     Mr. Ortiz knew that ISS Aviation was relying on Bell's promises of support, Bell's promises that ISS Aviation would function as its independent representative for the Guyana Deal, and Bell's promise to pay ISS Aviation the commission owed to it with respect to the Guyana Deal and all other transactions to which ISS Aviation procured.

42.     Bell lied. Bell never intended to provide ISS Aviation with the support and assistance or tools ISS Aviation needed, despite Bell's knowledge that ISS Aviation suffered significant attacks to its operations on behalf of Bell.

**D. Bell deliberately excludes ISS Aviation from the Guyana Deal.**

41.     Despite ISS Aviation's provision of its representative services and Bell's acceptance of the same under the Agreement, upon information and belief, Bell deliberately and sought to exclude ISS Aviation from concluding the transaction with the government of Guyana and the Guyana Defence Force.

42.     For approximately six years, ISS performed its representative obligations by working directly with Bell's regional sales manager and the managing director, vice president of the company in securing the business relations in Guyana.

43.     However, on or about early 2019, Bell removed the then regional sales manager that ISS Aviation worked with for many years. Bell did not immediately replace the regional sales manager at that time, which stifled ISS Aviation's progress in bringing the deal to a close. In other words, ISS Aviation was prevented from receiving phone calls and additional communications from the Guyana representatives because there was no regional sales manager in place to receive such communications, which wasan expectation setup between ISS Aviation Inc and the regional sales manager based on conditions at the time. After complete silence from Bell and months later, the acting regional sales manager contacted ISS Aviation asking for all of the information and updates on the Government of Guyana and the Guyana Defence Force - the Guyana Deal.

44.     Upon information and belief, the new acting regional sales manager began working behind ISS Aviation's back to meet with certain government officials of Guyana and other third parties to work on closing the deal without ISS Aviation.

45.     The new acting regional sales manager and Bell management conducted various meetings with Guyana officials and others without telling ISS Aviation despite the fact that

ISS Aviation was the representative and was actively lobbying the U.S. government to assist and support the Guyana deal.

46.     The new acting regional sales manager created the false impression that Bell was still committed to working with ISS Aviation on the Guyana Deal when he asked ISS Aviation to gather all of the information compiled thus far and forward the same along with the presentation materials drafted by ISS Aviation. The new acting regional sales manager also represented that the value of the deal was still at approximately $24 million and there were no major changes.

47.     ISS Aviation continued to incur various expenses related to acting as the representative in reliance on the fact that it was still operating as the representative.

48.     Had ISS Aviation known that Bell had already excluded ISS Aviation from the deal discussions, ISS aviation would not have continued to incur such expenses in connection with its representation and rely on the financial compensation after approximately 6 years of working on the deal with the government of Guyana.

49.     Bell had a duty to disclose the fact that it had decided to exclude ISS Aviation. Bell had a duty to disclose that it was having meetings in connection with the deal. Since it was always a part of the arrangements and business dealings for six years. Since it was always a part of the arrangements and business dealings for six years to keep ISS Aviation updated on all developments pertaining to the Guyana deal. Especially, since ISS Aviation was always steadfast in its belief that the government of Guyana deal was likely to close as time passed because the Bell helicopters were badly needed and wanted by the Guyana Defence Force. ISS Aviation always reminded Bell that it was not a case of "if" the Guyana Defence Force or the government of Guyana would buy Bell helicopters but "when" they would

buy Bell helicopters and Bell needed to be patient. Since the government of Guyana had changed three times while ISS Aviation was the independent representative in approximately six years.

50.     ISS Aviation has always told Bell that the government of Guyana had no search and rescue capabilities, no medium lift or twin engine helicopters and badly needed helicopters to be compliant with their search and rescue obligations in Guyana. Only Bell helicopters being operated by the government of Guyana were the single engine pre-owned Bell helicopters, ISS Aviation affiliate had sold over 10 years ago to the government of Guyana.

51.     Upon information and belief, the new acting regional sales manager, acting under Bell's direction, took all of the information, marketing intelligence and details about the deal with the Government of Guyana and the Guyana Defence Force, which were gathered and created by ISS Aviation, and proceeded to deal directly with the government of Guyana and the Guyana Defence Force, excluding ISS Aviation from any involvement. This was being done with the involvement of other third parties at the detriment of ISS Aviation Inc.

52.     ISS Aviation was never informed of the new acting regional sales manager's and Bell management's private communications or dealings with the government of Guyana despite it being the normal arrangements between ISS Aviation Inc and Bell for several years, particularly since ISS Aviation increased its lobbying of the U.S. government to assist with the Guyana Deal.

53.     On or about August of 2019, the new acting sales manager called ISS Aviation and informed ISS Aviation that it was not renewing the independent representation agreement.

54.     Upon and information belief, Bell had already began deliberately, intentionally and wrongfully taking full control over the deal to the exclusion of ISS Aviation despite ISS Aviation being the sole independent representative.

55.     Bell's unilateral decision to take over the deal discussions without notifying ISS Aviation and its decision to exclude ISS Aviation deliberately and intentionally from the deal discussion runs afoul of the Independent Representative Agreement and ultimately prevented ISS Aviation from participating and concluding the deal and getting the commissions it earned through ultimately procuring the deal. Compensation being relied upon after 6 years for financial relief for all the harm caused to ISS Aviation Inc while working on and closing the deal with the government of Guyana.

56.     This compensation was being relied upon after approximately 6 years for financial relief for all the harm caused to ISS Aviation Inc while working on and closing the deal with the government of Guyana. Allowing the restructuring of ISS Aviation and affiliated companies.

57.     As a way to cover their tracks and plan to exclude ISS Aviation, Bell sent ISS Aviation's CEO and Director, a correspondence asking for ISS Aviation to identify any deals it was working on and provide the details and quantity of the deal.

58.     Upon information and belief, Bell sought to box ISS Aviation to quantities and a value that were lower than the deal Bell informed ISS Aviation it was working on behind ISS Aviation's back. Indeed, upon information and belief, Bell had begun working on a deal to the value of $256 million dollar deal with Guyana while ISS Aviation was still the independent representative without any involvement from ISS Aviation. To be clear, ISS Aviation, according to the agreement and amendments thereto, was still the sole

independent representative until September of 2019 and should not have been deliberately and intentionally excluded or prevented from continuing to perform its obligations, which were clearly continuing without ISS Aviation participation.

59.    Moreover, upon information and belief, Bell caused the Guyana Deal with the Government of Guyana and the Guyana Defence Force from materializing within the timeframe to which it agreed ISS Aviation would be owed and entitled to if the deal had come to pass within the term period of the agreement and a year thereafter.

60.    Moreover, upon information and belief, it appears that Bell completely misrepresented the parameters of the Guyana Deal with the Government of Guyana and the Guyana Defence Force by suggesting over the course of six years that the deal and work done on the deal by ISS Aviation was only valued for around $25 million dollars, and subsequently reduced to $24 million.

61.    ISS Aviation invested extensive time, effort, and money in developing Bell's business relationship with the Government of Guyana and the Guyana Defence Force in adherence to the parties' agreement and further complied with all of its obligations, in order to establish a long-term business and representation of Bell's products in Guyana to the Government of Guyana and the Guyana Defence Force.

62.    ISS Aviation reopened, revitalized and secured the Government of Guyana and the Guyana Defence Force in the Guyana market *for* Bell helicopters, products, and services and incurred considerable costs and tremendous resources in its marketing and in its lobbying efforts with the United States government.

63.    Bell's obstruction of ISS Aviation amounts to a breach of the parties' agreement.

64.     Bell's obstruction of ISS Aviation prevented ISS Aviation from continued performance

65.     Bell's nondisclosure and exclusion of ISS Aviation from the deal it developed with the Government of Guyana and the Guyana Defence Force amounts to a breach of the agreement.

66.     Bell colluded and conspired with others to complete the deal with the Government of Guyana and the Guyana Defence Force without ISS Aviation, completely circumventing ISS Aviation's participation in the deal it initiated, cultivated, developed and secured for over six and a half years.

67.     Upon information and belief, the Guyana Deal commenced at some time in 2020.

68.     According to certain news articles, the Government of Guyana and the Guyana Defence Force in Guyana has made at least two purchases in connection with the Guyana Deal that ISS Aviation  initiated, cultivated, developed and secured for Bell Helicopter. Working on the completion of a deal with the government of Guyana valued at $256 million based on U.S. government released documents presented by Bell Helicopter to the U.S. government.

69.     Upon information and belief, Bell and the new acting regional sales manager,  new managing director, vice president and Bell's management decided not to renew the agreement based on the fact that they had already been dealing with Guyana government officials directly behind ISS Aviation's back. Denying ISS Aviation Inc of its compensation it has been awaiting for approximately 6 years after 6 years of dedication and commitment to the government of Guyana deal even when Bell Helicopter was in doubt.

70.     As of the date of this filing, Bell has not paid any of the owed commissions to ISS Aviation in relation to the Guyana Deal.

71.     In addition to commission owed on the Guyana Deal, Bell owes commission in relation to aircraft operated by Air Services Ltd. in Guyana which owns, operates and bought Bell helicopter parts and equipment for their two Bell helicopters from Bell, thought to be Bell helicopters with serial numbers 52138 and 52164 based and operated in Guyana. Bell has not paid any of the accrued commission through 2019.

72.     ISS Aviation is entitled to actual, consequential, exemplary damages.

## V.  CLAIMS

### A.     Breach of Contract.

73.     The facts set forth in the paragraphs above are incorporated herein by reference.

74.     Bell and ISS Aviation Guyana entered into a valid enforceable contract.

75.     ISS Aviation Guyana is the proper party to bring a claim for breach of contract and has performed all obligations under the contract.

76.     Accordingly, all conditions precedent to Bell's performance under the contract have been satisfied.

77.     Bell breached the contract by excluding ISS Aviation Guyana out of the Guyana Deal with the Government of Guyana and the Guyana Defence Force and intentionally preventing the consummation of the deal during the representative period.

78.     Bell breached the contract by failing to pay ISS Aviation Guyana in full for the services it provided on behalf Bell pursuant to the agreement.

79.     ISS Aviation Guyana was the procuring cause of the $256 million dollar deal.

80.     As a direct and proximate result of Bell's breach, ISS Aviation Guyana has suffered damages.

81.     ISS Aviation Wyoming is an intended third-party beneficiary of the agreement between ISS Aviation and Bell and has also suffered damages due to Bell's breach.

**B.      Quantum Meruit.**

81.     The facts set forth in the paragraphs above are incorporated herein by reference.

82.     Pleading in the alternative, and without waiving the above, Bell requested that ISS Aviation provide Bell with services, including being Bell's independent representative.

83.     ISS Aviation did represent Bell with respect to the Guyana Deal and other transactions in the Guyana region and near territories in expectation of Bell compensating ISS Aviation for the same.

84.     Bell received and retained the benefit of services having a reasonable value in excess of $12.5 million dollars, without paying the full value for same.

**C.      Promissory Estoppel.**

85.     The facts set forth in the paragraphs above are incorporated herein by reference.

86.     Bell made a promise to ISS Aviation Guyana and ISS Aviation Wyoming regarding its commitment to ISS Aviation being Bell's independent representative.  Bell further promised that it would support Bell with the tools and resources necessary to secure the Guyana Deal.  Bell further promised that it would pay ISS Aviation commissions it was entitled to receive for transactions procured by ISS Aviation on Bell's behalf.

87.     It was foreseeable by Bell that ISS Aviation would rely on Bell's promises to perform as promised.

88.   ISS Aviation did in fact substantially rely on these promises by Bell as shown by the facts above. ISS Aviation relied to its detriment.

89.   ISS Aviation is entitled to be compensated for the damages suffered in reliance on Bell's promises.

**D.**   **Unjust Enrichment.**

90.   The facts set forth in the paragraphs above are incorporated herein by reference.

91.   The facts set forth in the paragraphs above are incorporated herein by reference.

92.   ISS Aviation is entitled to recover from Bell an amount in excess of $12.5 million dollars, or such other amount shown as due and owing at the final trial of this matter, under the theories of quantum merit.

93.   Bell received benefits and will continue to receive benefits from the hard work initiated, cultivated, developed and secured by ISS Aviation Inc for Bell Helicopter —the proceeds from the sale of and marketing of Bell helicopters and products related to sales in the territory of Guyana to the Government of Guyana and the Guyana Defence Force that it would be unconscionable to retain. ISS Aviation requests judgment against Bell for all amounts equal to the commission ISS Aviation would have been entitled to from the marketing and sale of helicopters for the deal valued $256M dollars to the Government of Guyana and the Guyana Defence Force in Guyana.

**D.**   **Fraud/ Fraudulent Inducement.**

94.   The facts set forth in the paragraphs above are incorporated herein by reference.

95.   Bell represented to ISS Aviation that it would pay certain compensation to ISS Aviation for its services.

96.     Bell further promised and represented that it would fully support ISS Aviation and provide necessary assistance to ISS Aviation for its completion of the Guyana Deal.

97.     Bell further represented that the deal had a value of $25 million dollars initially.

98.     The representations were material and false because Bell never intended to fully perform. And Bell ended up working behind ISS Aviation's back, although using all of ISS Aviation's materials to ultimately complete the deal without ISS Aviation.

99.     Bell's actions are indicia of its intent to get the deal secured without ISS Aviation and reflect that it never intended to follow through with its promise and representations.

100.    Upon information and belief, Bell knew at the time of its promise that it did not intend to fully perform. Upon information and belief, Bell had already begun connecting with other third parties and potential representatives and had already started meeting with Guyana government officials in secret and unbeknownst to ISS Aviation.

101.    Bell made the representation with the intent to induce ISS Aviation to act on it.

102.    ISS Aviation did in fact rely on the representation.

103.    Bell's false representation caused ISS Aviation injury.


**E.      Fraud by Non-Disclosure**

104.    The facts set forth in the paragraphs above are incorporated herein by reference.

105.    Bell had a duty to disclose information to ISS Aviation, including but not limited to its decision to conduct business meetings and deal discussions without ISS Aviation and the value of the deal contemplated by Bell from the beginning.

106.    The facts Bell withheld were material and Bell knew that ISS Aviation was ignorant of the facts and that ISS Aviation did not have an opportunity to discover them.

107.    Bell was deliberately silent after their initial representations it had a duty to speak.

108.    By failing to disclose the facts, Bell intended to induce ISS Aviation to take some action or refrain from taking action. ISS Aviation relied on Bell's nondisclosure, and  was injured as a result of acting and /or failing to act without the knowledge of the undisclosed facts.

## VI.  ATTORNEY'S FEES

109.    ISS Aviation seeks reasonable and necessary attorney's fees, expenses, and court costs it has and will incur in this suit in enforcing its rights and remedies against Bell pursuant to Sections 38.001 of the Texas Civil Practice & Remedies Code and all other applicable statutes of law.

## VII.  EXEMPLARY DAMAGES

110.    ISS Aviation's injuries resulted from the malice or wanton disregard of its rights by Bell, which entitles Plaintiffs to exemplary damages.

## VIII.  TRIAL BY JURY

111.    ISS Aviation hereby requests a trial by jury and will submit the appropriate jury fee.

## IX.  CONDITIONS PRECEDENT

112.    All conditions precedent, if any, to ISS Aviation's right of recovery have been performed, have occurred, or have been waived.

## X.  PRAYER

WHEREFORE, THE PREMISES CONSIDERED, Plaintiffs ISS Aviation, Inc., (Wyoming) and ISS Aviation (Guyana); respectfully pray and request that Bell Helicopter Textron,

Inc. be cited to appear and answer herein and that the Court award Plaintiffs judgment against Bell

Textron, Inc. for damages, including without limitation actual damages, consequential, exemplary

damages, as well as attorney's fees, costs of Court, and pre- and post-judgment interest. Plaintiffs

respectfully request the Court grant all other relief to which Plaintiffs are justly entitled.

Dated: August 30, 2022                    Respectfully submitted,

                                          */s/ Jervonne D. Newsome*
                                          Jervonne D. Newsome
                                          Texas Bar No. 24094869
                                          jnewsome@lynnllp.com
                                          Michele Naudin
                                          Texas Bar No. 24118988
                                          mnaudin@lynnllp.com
                                          **LYNN PINKER HURST & SCHWEGMANN, LLP**
                                          2100 Ross Avenue
                                          Suite 2700
                                          Dallas, Texas 75201
                                          Telephone: (214) 981-3000
                                          Facsimile: (214) 981-3839

                                          **ATTORNEY FOR PLAINTIFFS**